NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DOREEN K. HIGGINS,**

        **Plaintiff,**

**-vs-**                                                **Case No. 6: 11-cv-1221-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by Doreen K. Higgins seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 13, 15, and the parties' memoranda, Doc. Nos. 23, 24.  Pursuant to the consent of the parties, this matter has been referred to the undersigned for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 14, 16.

### PROCEDURAL HISTORY.

In 2006, Higgins filed applications for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq*. (sometimes referred to herein as the "Act").  She alleged that she became disabled on February 18, 2006.  R. 135, 141.  She subsequently amended her disability onset date to February 6, 2008.  R. 25.

Not for Publication

After her applications were denied initially and on reconsideration, an administrative law judge ("ALJ") held a hearing at Higgins's request. Higgins, represented by an attorney, Higgins's husband and a vocational expert ("VE") testified at the hearing. R. 22-63.

After considering the testimony and the medical evidence presented, the ALJ determined that Higgins was insured under OASDI through March 31, 2013. R. 12. The ALJ found that Higgins had not engaged in substantial gainful activity since the alleged amended disability onset date. *Id.*

The ALJ concluded that Higgins had an affective disorder and a history of substance abuse disorder, which were severe impairments. R. 12. The ALJ found that Higgins's condition did not meet or equal any listed impairment. R. 13.

The ALJ found that Higgins had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations: "claimant is able to understand, remember, and carry out simple instructions; able to perform simple routine tasks; and, able to have only occasional interaction with others." R. 14.

The ALJ concluded that Higgins could not return to her past relevant work. R. 18. After considering testimony from a VE, the ALJ found that there was work available in the national economy that Higgins could perform. R. 19. Therefore, the ALJ concluded that Higgins was not disabled. R. 20.

Higgins sought review of the ALJ's decision by the Appeals Council. On May 18, 2011, the Appeals Council issued a decision finding no basis to change the ALJ's decision. R. 1-2.

Higgins seeks review of the Commisioner's decision by this Court.

NOT FOR PUBLICATION

## JURISDICTION AND STANDARD OF REVIEW.

Higgins having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3). A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)(per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE EVIDENCE.

After a thorough review of the record, I find that the facts are adequately stated in the ALJ's decision and the parties' memoranda. Therefore, I will only summarize the pertinent evidence to protect Higgins's privacy to the extent possible.

Higgins was born in 1972. R. 26. She graduated from college with a degree in Science and Business Management. R. 26. She previously worked in the insurance industry as a customer service representative. R. 27-28.

Medical records reflect that Higgins was hospitalized from February 19 through 21, 2006 after hearing voices, having racing thoughts and being impulsive. Mahendra B. Shah, M.D., determined that Higgins had bipolar disorder, mixed. She improved with medication. R. 339-42. Higgins's global assessment of functioning ("GAF") score was 40 at admission and 50 for the past year. R. 346.

Aloma Alcober, M.D., a psychiatrist, evaluated Higgins on March 20, 2006. Dr. Alcober observed that Higgins had slightly pressured speech and her affect was slightly elated. R. 360. Her insight and judgment were limited. The assessment was bipolar

NOT FOR PUBLICATION

disorder, manic with a history of marijuana dependence. Her current GAF score was 60. Dr. Alcober prescribed additional medication. R. 381-82. Dr. Alcober continued to treat Higgins through April 2007. R. 383-91. In June 2006, Higgins was less depressed and her concentration improved. She had no adverse effects from her medication. R. 385. On August 9, 2006, she was not depressed and her mood was euthymic. R. 386. In February 2007, Higgins was stressed by studying for an accounting certification, but she was not depressed and her mood was more stable. R. 389. Her GAF scores were 60 to 65. R. 383, 385, 389.

On February 10, 2008, Higgins was involuntarily hospitalized for her own safety due to recent mood fluctuations. She had not been taking her medication. R. 433, 438. She was treated with medication and discharged two days later. R. 433. Her GAF score was 40 at admission and 50 on discharge. R. 434. As of February 13, 2008, she was anxious, delusional and in a manic stage. R. 396, 427. In March 2008, Higgins reported that her bipolar disorder was controllable but not yet stable. She used marijuana to calm down. R. 394.

Higgins was hospitalized again on February 25, 2008 due to mania and threatening to hurt herself and her husband. She had been refusing to take her medication. Higgins admitted to using marijuana. R. 518. Fredesvinda Jacobs-Alvarez, M.D., observed that Higgins was somewhat agitated and her speech was rapid. Her thoughts were disorganized and racing and her affect was labile. The diagnosis was bipolar disorder and cannabis dependency with a GAF score of 30. R. 519. She was discharged on March 4, 2008 after being stabilized on medication. Her GAF score on discharge was 49. R. 520.

NOT FOR PUBLICATION

Higgins was hospitalized again on March 10, 2008 by her husband.  R. 403, 407. She was belligerent and initially refused to take her medication.  R. 425.  Her GAF score was 30 on admission and 55 on discharge.  The diagnosis was bipolar type I disorder, most recent episode manic with psychotic features, and cannabis abuse.  R. 426.

Sonny Joseph, M.D., a psychiatrist, examined Higgins on March 26, 2008.  Dr. Joseph observed that Higgins's mood was anxious and her affect labile.  Her insight and judgment were within normal limits.  R. 445.  He adjusted her medication and indicated that she should continue counseling.  R. 446.  He observed on April 11, 2008 that Higgins's mood was depressed but her affect was appropriate.  R. 449.  On May 23, 2008, Dr. Joseph observed that Higgins was less depressed and her affect was appropriate.  R. 547.

On May 20, 2008, Theodore Weber, Psy.D., prepared mental RFC assessments based on review of Higgins's records.  Dr. Weber opined that Higgins would be moderately limited in activities of daily living, social functioning and maintaining concentration, persistence or pace with one or two episodes of decompensation.  R. 464.  She would be moderately limited in the ability to do the following:  understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, set realistic goals or make plans independently of others.  R. 451-52.

NOT FOR PUBLICATION

In the functional capacity assessment part of the form, Dr. Weber opined as follows:

- "Would [be] able to understand and remember simple instructions, but would have difficulties with more detailed instructions"

- "Would [be] able to complete simple tasks/work procedures and be able to make work decisions but would have difficulties with maintaining attention and concentration for extended periods and would have difficulties carrying out detailed instructions"

- "Would be able to cooperate and be socially appropriate but would have difficulties accepting criticism from supervisors"

- "Would be able to react/adapt appropriately to the work environment but would have some difficulties setting realistic goals"

- "Overall, capable of completing simple tasks on a regular basis from a mental standpoint. . . . The cl has recently gone off meds and has had a series of hospital stays with improvement shown when compliant with meds. She would likely function better if not using marijuana for 30 days or more. . . . [A]ppears independent in her ADLs."

R. 453.

On June 7, 2008, Dr. Joseph completed a treating source statement. He wrote that Higgins had irrational thinking during mood swings, racing thoughts, unstable emotions, and poor concentration. R. 469. He opined that, due to chronic mental illness, Higgins was permanently and totally disabled from an employment standpoint. R. 470.

In November 2008, Maryann Wharry, Psy.D., prepared mental RFC assessments after review of Higgins's records. She concurred with the opinion of Dr. Weber with the additional findings that Higgins would be moderately limited in the ability to work in coordination with or proximity to others without being distracted by them and in the ability to set realistic goals or make plans independently of others. R. 495-96, 509. In the functional capacity assessment portion of the form, Dr. Wharry indicated that "when compliant with

NOT FOR PUBLICATION

medication, [Higgins] should be capable of initiating and completing relatively routine tasks on independent basis. May benefit from reduced social demands." R. 497.

In his treatment notes dated December 2008 and March 2009, Dr. Joseph noted that Higgins was less depressed and had an appropriate affect. He adjusted her medication. R. 548.

On May 5, 2009, Audrey Seed, LCSW, one of Higgins's counselors, prepared a statement regarding Higgins's mental abilities. She opined that Higgins had fair to poor or no ability in most areas. She further opined that Higgins could not function in any work setting due to a chronic mental illness. R. 556-57.

On May 13, 2009, Dr. Joseph prepared a mental abilities statement for Higgins. He indicated that Higgins would have poor to no ability to perform the demands of unskilled work. R. 558. He based his assessment on Higgins's irrational, unreliable thinking during mood swings, racing thoughts and poor concentration from bipolar disorder. R. 558. He reiterated that Higgins was permanently and totally disabled. R. 559.

At the ALJ's hearing, Higgins testified that she struggled with motivation since she began taking Lithium. R. 36. She took a nap every day. R. 37-38. She believed she could not work because she could not control her emotions resulting in rages and she suffered anxiety. R. 38. She felt suicidal two weeks before the hearing due to economic stress at home. *Id.* She sometimes had racing thoughts which were relieved by medication. R. 40.

During the day, Higgins watched television. She also walked and fed two dogs. She could shop for groceries and attend to her personal hygiene, although she took a shower only once a week. R. 42-43. She testified that she regularly smoked marijuana through

NOT FOR PUBLICATION

March 2006 but ceased using it when she was diagnosed with bipolar disorder. R. 44. She was arrested for marijuana possession in February 2008. R. 49.

Michael Thomas Higgins, Plaintiff's husband, testified that since Higgins was last hospitalized in March 2008 she could function at home, but not outside of home. If someone triggered a rage, Higgins would be obsessed for a day or longer. R. 49-51. Higgins called him for directions two or three times when she did not remember how to get home from a doctor's office. R. 50.

After considering the evidence and testimony, the ALJ asked the VE to consider the following hypothetical individual:

> [A]n individual who is the same age as the claimant, same education background and past work experience that you identified. And further assume that this individual has no . . . allegations of any physical problems. However, the individual I'm describing can only understand, remember and carry out simple instructions and perform simple, routine tasks.

R. 56-57. The VE testified that this individual could not perform Higgins's past relevant work. However, the individual could perform the unskilled work of ticket taker, mail clerk and counter clerk. R. 57. If the individual could additionally have only occasional interaction with others, the VE testified that the person could perform the jobs of mail clerk, small production assembler and produce weigher. R. 57-58. The VE testified that there were no conflicts between his testimony and the DOT. R. 58. If the individual had poor to no ability to remember work-like procedures, understand, remember and carry out very short and simple instructions and maintain attention for two-hour segments, there would be no work the individual could perform. R. 62.

NOT FOR PUBLICATION

**ANALYSIS.**

Higgins asserts that the ALJ erred by failing to give adequate weight to the June 7, 2008 opinion of Dr. Joseph and by failing to consider all of Dr. Joseph's records, which she contends are largely illegible. She further asserts that the ALJ erred by failing to include all of the limitations indicated by the reviewing psychologists in the RFC assessment. She submits that the hypothetical question to the VE was incomplete and that there was a conflict between the VE's testimony and the DOT. Finally, she contends that the ALJ failed to state with specificity reasons supporting the conclusion that her testimony was not completely credible. These are the only issues I will consider.

    A.    *Opinion of Dr. Joseph.*[1]

Higgins contends that the ALJ erred by failing to make explicit reference to Dr. Joseph's opinion dated June 7, 2008 and to state the weight given to that opinion. She contends that because Dr. Joseph was one of her treating physicians, his June 7, 2008 opinion was entitled to substantial weight unless good cause was shown to the contrary, citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

The ALJ's opinion shows that he considered Dr. Joseph's opinion of June 7, 2008, as reflected by his citation to Exhibit 14F where this opinion is found in the record. R. 16. The ALJ gave little weight to Dr. Joseph's opinions because they were inconsistent with his own medical records. This finding is supported by substantial evidence in the record. R. 16. As discussed above, in April 2008, Dr. Joseph noted that Higgins's mood was depressed but her affect was appropriate. From May 2008 through March 2009, Dr. Joseph's notes reflect that Higgins was less depressed and her mood was appropriate. Law in this circuit

---

[1] The Court did not find Dr. Joseph's notes to be illegible. Therefore, Higgins's argument that the ALJ failed to consider Dr. Joseph's records because they were illegible is not supported by the record.

NOT FOR PUBLICATION

indicates that good cause exists not to give significant weight to the opinion of a treating physician that is inconsistent with his own medical records. *Lewis*, 125 F.3d at 1440.

Because the ALJ followed the governing law in his assessment of Dr. Joseph's opinions and substantial evidence supports his conclusion, this assignment of error is unavailing.

### B. Opinions of the Reviewing Psychologists.

The ALJ gave great weight to the opinions of Dr. Weber and Dr. Wharry, reviewing psychologists. R. 17. Higgins contends that the ALJ erred by not including each of the moderate limitations checked by these psychologists in their respective forms in the RFC assessment and questions to the VE.

The Commissioner argues that the boxes checked on the forms are merely a summary of the reviewing psychologists's findings. He contends that a reviewing psychologist's functional capacity assessment is found in Section III of the mental RFC form. In support of this argument, the Commissioner relies on the SSA's Program Operations Manual System ("POMS"). POMS does not have the force of law, and the ALJ was not required to follow its instructions. *Wells v. Comm'r of Soc. Sec.*, 430 F. App'x 785, 786-87 (11th Cir. 2011)(unpublished decision cited as persuasive authority).

Nevertheless, Dr. Weber and Dr. Wharry's mental RFC assessments summarize the conclusions from the checked boxes in the "Functional Capacity Assessment" portion of their respective mental RFC forms. Consistently with Dr. Weber's Functional Capacity Assessment, the ALJ limited Higgins to work involving simple instructions. In accordance with Dr. Wharry's Functional Capacity Assessment, the ALJ also limited Higgins to work involving simple, routine tasks. Because both of these psychologists indicated that Higgins

NOT FOR PUBLICATION

would have problems with social interaction, the ALJ limited Higgins to work requiring only occasional interaction with others.

Because the ALJ included in the RFC and questions to the VE all of the RFC limitations indicated by Dr. Weber and Dr. Wharry in their respective Functional Capacity Assessments, the argument that the ALJ failed to credit each of the limitations indicated by these psychologists is not supported by the record.

*C. Testimony of the VE.*[2]

Higgins contends that the testimony of the VE is inconsistent with the DOT because the jobs of mail clerk and small products assembler require a higher level of reasoning than is consistent with the ability to follow only simple instructions. The VE testified, however, that there was no conflict between his opinion and the DOT.

Controlling law in this circuit provides that if the testimony of a VE is inconsistent with a provision of the DOT, the testimony of the VE controls. *Jones v. Apfel*, 190 F.3d 1224, 1229-30 (11th Cir. 1999). Social Security Ruling 00-4p, which was issued after *Jones*, requires an ALJ to inquire on the record whether there are any inconsistencies between the VE's testimony and the DOT. Soc. Sec. Ruling 00-4p, 2000 WL 1898704, at * 4 (2000). The ALJ made this inquiry, and the VE testified that there was no conflict. Counsel for Higgins's speculation that a conflict exists is insufficient to override the testimony of the VE, who is an expert in the area, that there was no conflict.

Accordingly, this assignment of error is not supported by the record.

---

[2] The argument that the ALJ erred by failing to include all the limitations checked by Drs. Weber and Wharry in the hypothetical question fails based on the analysis in subpart B entitled "Opinions of the Reviewing Psychologists," *supra*.

-11-

### D.  Credibility.

The ALJ found that Higgins's testimony was not credible to the extent that it was inconsistent with his RFC assessment.  R. 18.  When, as here, an ALJ does not credit a claimant's testimony about her functional limitations, the ALJ "must articulate explicit and adequate reasons for doing so."  *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).  Higgins contends that the ALJ failed to articulate explicit reasons supported by evidence in the record for his credibility finding.

Review of the ALJ's decision reflects ample reasons to support the credibility finding.  The ALJ correctly noted that Dr. Joseph's treatment notes showed that Higgins's condition improved as of May 2008.  R. 16.  Despite periods of low motivation, the ALJ correctly observed that Higgins could go out independently, including to a grocery store and to a doctor's office.  R. 13, 18.  The ALJ also correctly observed that problems with racing thoughts were resolved when Higgins was compliant with medication.  R. 15.

Because the ALJ articulated specific reasons to support his conclusion that Higgins's statements about her functional limitations were not entirely credible, and substantial evidence in the record supports those reasons, the ALJ did not err in his credibility finding.

### CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** this 20th day of September, 2012.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE